# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, )<br>)<br>)<br>) | |
| Plaintiff, ) | Case No. ___ -cv- _____ |
| v. ) | |
| ) | Hon. _____ |
| MARK T. TURKCAN, ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission") alleges as follows:

### SUMMARY

1.      From at least 1990 through April 2008, Defendant Mark T. Turkcan ("Turkcan" or "Defendant"), the former President of First Bank Mortgage ("FBM"), defrauded investors by engaging in a scheme to misstate the net income of FBM and its parent First Banks, Inc. by secretly obtaining money from third-party brokerage firms through the surreptitious use of repurchase transactions, which are essentially collateralized loans, and improperly disguising the money obtained from those transactions as trading gains (and more rarely losses).  In May 2008, shortly after terminating Turkcan for reasons unrelated to his scheme, FBM discovered the scheme and that it owed approximately $35 million in liabilities under outstanding repurchase agreements as a result of Turkcan's scheme.

2.     Turkcan concealed his scheme by lying to his staff and his superiors, falsifying and fabricating documents, and providing false and misleading information to First Banks, Inc. and its outside auditor.

3.     As a result of Turkcan's activities, First Banks, Inc. did not disclose Turkcan's scheme and misstated its reported net income in its public filings.  On July 30, 2008, First Banks, Inc. restated its financial results for the years 2005 through 2007 and disclosed that it had discovered material misstatements in its financial statements arising out of the circumvention of established internal controls and material weaknesses in its internal controls over financial reporting.

4.     Turkcan, directly and indirectly, has engaged and, unless enjoined, will continue to engage in acts, transactions, practices, and courses of business that violate Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2] thereunder and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and has aided and abetted, and unless enjoined, will continue to aid and abet acts and conduct that constitute violations of Section 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] thereunder.

5.     The Commission brings this action to, among other things, enjoin such acts, transactions, practices, and courses of business pursuant to Sections 20(b) and 20(e) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(e)] and Sections 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa], and 28 U.S.C. §1331.

7.      Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].

8.      The acts, transactions, practices, and courses of business constituting the violations alleged herein occurred within the jurisdiction of the United States District Court for the Eastern District of Missouri and elsewhere.

9.      Turkcan, directly and indirectly, has made use of the means and instrumentalities of interstate commerce and/or of the mails in connection with the acts, transactions, practices, and courses of conduct alleged in this Complaint in the Eastern District of Missouri and elsewhere.

10.     There is a reasonable likelihood that unless enjoined, Turkcan will continue to engage in the acts, transactions, practices, and courses of business set forth in this complaint and acts, transactions, practices, and courses of business of similar purport and object.

11.     Pursuant to authority conferred upon the Commission by the Exchange Act [15 U.S.C. § 78a et seq.], the Commission has promulgated Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, 240.13b2-1, and 240.13b2-2], which were in effect at all times relevant and at the present time.

**DEFENDANT**

12.     Mark T. Turkcan, age 53, is a resident of Kirkwood, Missouri.  Turkcan began his

career with First Banks, Inc. in 1990 and held various positions there and/or at its subsidiaries.

He served as President of FBM from at least 1991 through his termination in May 2008, and was

responsible for the secondary marketing of mortgages, including the trading and selling of

mortgage-backed securities.  He also served on First Banks, Inc.'s management committee until

his termination and on its executive committee until approximately 2005.  Turkcan also was an

Executive Vice President of First Bank, a subsidiary of First Banks, Inc. and the entity of which

FBM is a division, and served as a director of First Bank until 2004.

13.     From at least 2003 until his termination in May 2008, Turkcan reported directly to

First Banks, Inc.'s Chief Executive Officer or its Chief Financial Officer.

14.     Prior to 1990, Turkcan was employed at Sheahan Financial ("Sheahan

Financial"), which was a subsidiary of Clayton Savings & Loan Association ("Clayton

Savings").

**FBM**

15.     FBM is a residential mortgage lender operating primarily in the St. Louis,

Missouri area.  FBM originates and underwrites residential mortgage loans, packages some of

them into mortgage-backed securities, and sells those mortgage-backed securities to third parties

such as Bear, Stearns & Co., Inc. ("Bear Stearns").  Since 1990, FBM has operated either as a

subsidiary or division of First Bank, a banking institution headquartered in Creve Coeur,

Missouri.  Currently, FBM operates as a division of First Bank.

16.     First Bank is a subsidiary of First Banks, Inc., a registered bank holding company

organized under the laws of Missouri and headquartered in Clayton, Missouri.  Since at least

March 2003, First Banks, Inc.'s trust preferred securities have been registered pursuant to Section 12(b) of the Exchange Act and have traded on the New York Stock Exchange under the symbol "FBSPrA."  First Banks, Inc. also had securities registered pursuant to Section 12(g) of the Exchange Act that traded on the NASDAQ Stock Market's National Market system under the symbols "FBNKN" and "FBNKM" until they were delisted on or about September 30, 2005 and December 31, 2006, respectively.

17.     Pursuant to Section 13(a) of the Exchange Act, and the rules and regulations thereunder, First Banks, Inc. filed periodic and other informational reports, including Forms 10-K and Forms 10-Q, with the Commission.  These periodic reports contained First Banks, Inc.'s consolidated financial statements, which were based in part on the financial results of FBM.

## FACTS

**A.     Background**

18.     Turkcan's fraudulent activities began in 1987, while he was working for Sheahan Financial.  Turkcan's responsibilities at Sheahan Financial included the trading and selling of mortgage-backed securities.

19.     In the wake of the large market downturn commonly referred to as "Black Monday", Turkcan's trading activities resulted in an approximately $5 million loss to Sheahan Financial.  Rather than disclose this loss to Sheahan Financial, he concealed the loss by secretly obtaining $5 million from McKeige & Co. ("McKeige") and improperly disguising that money as a $5 million "profit" on the books and records of Sheahan Financial.

20.     Specifically, Turkcan obtained the $5 million by entering into an unauthorized repurchase transaction on behalf of Sheahan Financial with McKeige.  A repurchase transaction ("repo") is essentially a collateralized loan where one party (effectively, the borrower) transfers

securities to a counterparty (effectively, the lender) as collateral with an agreement to
"repurchase" the securities on a later date for a higher price.  As part of this repo transaction,
Turkcan clandestinely transferred certain of Sheahan Financial's mortgage-backed securities to
McKeige as collateral for the $5 million he borrowed on behalf of Sheahan Financial.

21.     Turkcan falsely represented to Sheahan Financial that the repo proceeds were
actually trading profits.  He falsified a trade ticket and order confirmation to reflect a trading
gain of approximately $5 million and then hid the legitimate confirmation sent to Sheahan
Financial by McKeige evidencing the terms of the repo.  Turkcan then presented his falsified
documents purporting to show a trading gain to Sheahan Financial so that the gain would be
reflected in Sheahan Financial's books and records.

22.     Unbeknownst to Sheahan Financial, Turkcan's actions caused it, and therefore its
parent Clayton Savings, to overstate net income and understate liabilities by approximately $5
million.

23.     When First Banks, Inc. acquired Clayton Savings in 1990, Turkcan's fraudulent
transaction was not reflected properly in the financial statements of Clayton Savings.

24.     Turkcan's fraudulent conduct escalated after the acquisition when First Banks, Inc.
changed the name of Sheahan Financial to FBM, and he became FBM's President.  He continued
entering into unauthorized repos on behalf of FBM and falsely representing to FBM and others that the
proceeds from the repos were trading profits.  Turkcan's practice was to pay off the balance of one repo
with the proceeds from a new unauthorized repo, essentially rolling over the debt from firm to firm.  In
November 1998, Turkcan rolled over the entire debt that had increased to over $9.8 million to Bear
Stearns.

**B.     Turkcan's Escalating Scheme**

25.     From 1998 through his termination in May 2008, Turkcan continued his fraudulent

conduct in his role as president of FBM.  In November 1998, Turkcan entered into a master repurchase

agreement with Bear Stearns on behalf of FBM.  Under the master repurchase agreement, Turkcan was

able to enter into numerous repo transactions that enabled him to borrow approximately $35 million on

behalf of FBM.  He directed FBM's accounting staff to book fictitious gains purportedly made from

trading mortgage-backed securities with Bear Stearns when, in fact, these gains were nothing more than

proceeds from the unauthorized repos.

26.     In the unauthorized repo transactions, Turkcan caused FBM to transfer certain mortgage-

backed securities from FBM's inventory to Bear Stearns as collateral in exchange for a cash loan and an

agreement that FBM would "repurchase" the securities at a higher price on a later date, typically in 30

days.  The higher price essentially constituted the market value of the securities plus interest and fees

that Bear Stearns charged FBM for the repo.  The mortgage-backed securities that Turkcan caused to be

transferred to Bear Stearns were securities that FBM had intended to sell as part of its normal business.

On the date when FBM was to "repurchase" the securities, Turkcan typically "rolled over" the repo for

another term by directing Bear Stearns to sell the securities as FBM originally intended and then causing

FBM to transfer new mortgage-backed securities to Bear Stearns as replacement collateral.

27.     In addition to continuing to conceal the mounting debt that had surpassed the initial $5

million loss that he incurred while at Sheahan Financial, Turkcan also sought repos to disguise shortfalls

in FBM's quarterly and annual financial targets, a practice in which he engaged frequently.  As

President of FBM, Turkcan was responsible for, and his compensation was related to, FBM meeting its

quarterly and annual net income targets established by his superiors.  In these instances, Turkcan

informed Bear Stearns that FBM wanted to enter into a new repo.  Bear Stearns then wired funds into

First Bank's general account on a date specified by Turkcan and, if necessary, Turkcan instructed an employee to transfer additional mortgage-backed securities from FBM to Bear Stearns to serve as additional collateral.

28.     In rare instances when FBM's financial results were better than expected, such as in 2003, Turkcan caused FBM to pay down a portion of the outstanding debt to Bear Stearns.  In these instances, Turkcan, as part of his scheme, disguised the payments to Bear Stearns as trading losses.

29.     To conceal the true nature of the repos, Turkcan falsified documents, directed the entry of fraudulent journal entries, and made misrepresentations to FBM's accounting staff, his superiors, and First Banks, Inc.'s outside auditor.

30.     Turkcan provided fictitious trade tickets and confirmations to one of his subordinates, a Vice President of Investor and Corporate Accounting for FBM ("Vice President"), for entry into FBM's accounting system.  He also instructed the Vice President to redirect to him the monthly account statements that Bear Stearns mailed to the Vice President.  These statements, which reflected the true nature of FBM's transactions with Bear Stearns, were not provided to First Banks, Inc.'s internal auditors or to its outside auditor during their audits of FBM.

31.     At the end of each month, Turkcan prepared a handwritten report in which he, among other things, identified the journal entries to be made in FBM's general ledger to account for gains and losses on FBM's trading of mortgage-backed securities.  The "gains" that Turkcan indicated in these reports were, in fact, proceeds that he improperly obtained in the repo transactions.  He signed and dated these reports to indicate that he had approved them and provided them to the Vice President for entry into FBM's accounting system.  The fictitious journal entries that Turkcan directed then were made by FBM's accounting staff and altered the balances in FBM's general ledger, which was consolidated into First Banks, Inc.'s general ledger.

32.     Turkcan created a register each year to aid him in keeping track of his scheme.  He included on each register the fictitious trades of the mortgage-backed securities and FBM's fabricated gains or losses from those trades.  Turkcan provided his registers to First Banks, Inc.'s internal auditors, its outside auditor, and the management of First Bank.

33.     Turkcan knew, or was reckless in not knowing, that the fictitious journal entries that he directed the Vice President to enter into FBM's general ledger were false and misleading and caused First Banks, Inc.'s publicly reported financial statements to be false and misleading.

34.     Turkcan knew, or was reckless in not knowing, that the registers containing FBM's fabricated gains and losses from fictitious trades of mortgage-backed securities that he created and provided to First Banks, Inc.'s outside auditor and others were false and misleading and caused First Banks, Inc.'s publicly reported financial statements to be false and misleading.


## C.      The Impact of Turkcan's Fraud

35.     Turkcan's accounting scheme materially affected First Banks, Inc.'s reported financial results from at least the years 2003 through 2007.  As a result of Turkcan's scheme, First Banks, Inc. overstated its net income in its public filings by approximately: $1.3 million (or 1.6%) in 2004; $1.4 million (or 1.5%) in 2005; $3.5 million (or 3.2%) in 2006; and $5.3 million (or 10.2%) in 2007.  Turkcan's scheme also caused First Banks, Inc. to understate its net income by approximately $800,000 (or 1.3% in 2003).  Specifically, Turkcan caused First Banks, Inc. to materially misstate, among other things, its net income in its: Forms 10-K that were filed on March 25, 2004, March 31, 2005, March 27, 2006, March 28, 2007, and March 26, 2008; Forms 10-Q that were filed on May 14, 2003, August 14, 2003, November 13, 2003, May 14, 2004, August 13, 2004, November 15, 2004, May 13, 2005, August 15, 2005, November 14, 2005, May 12, 2006, August 11, 2006, November 13, 2006, May 14, 2007,

August 13, 2007, and November 14, 2007; and Forms 8-K that were filed on July 31, 2003, October 28,

2003, January 26, 2004, April 23, 2004, July 23, 2004, October 28, 2004, January 27, 2005, April 28,

2005, July 28, 2005, October 27, 2005, January 25, 2006, April 27, 2006, July 27, 2006, October 26,

2006, January 24, 2007, April 26, 2007, July 26, 2007, October 25, 2007, and January 23, 2008.  In

addition, First Banks, Inc. incorporated certain of these materially misstated financial results in private

placement agreements regarding its issuance of variable rate trust preferred securities on February 16,

2006, April 27, 2006, June 14, 2006, December 6, 2006, February 23, 2007, and August 29, 2007.

36.     These public filings and private placement agreements were materially misleading

because a reasonable investor would consider it important that First Banks, Inc.'s net income was

substantially different than actually reported due to one of its officers perpetrating a fraudulent scheme

to misstate his division's earnings.

37.     On July 30, 2008, First Banks, Inc. filed a Form 10-K/A amending its previously-filed

annual report for 2007.  In that filing, First Banks, Inc. restated its financial results for the years 2005

through 2007 and disclosed that it had discovered material misstatements in its financial statements

arising out of the circumvention of established internal controls and material weaknesses in its internal

controls over financial reporting.

38.     Turkcan knew, or was reckless in not knowing, that his fraudulent scheme caused

First Banks, Inc. to make material misstatements and omissions in its public filings with the

Commission.  Turkcan reviewed First Banks, Inc.'s public filings before they were filed with the

Commission and knew, or was reckless in not knowing, that they did not disclose his scheme and

materially misstated First Banks, Inc.'s net income.

**D.      Providing False and Misleading Statements to First Banks, Inc.'s Auditor**

39.      From at least 2003 until his termination in May 2008, Turkcan was an officer of First Banks, Inc.

40.      From at least 2003 through the present, First Banks, Inc. has retained KPMG LLP ("KPMG"), a public accounting firm, to, among other things, audit its annual consolidated financial statements.

41.      In connection with KPMG's annual audits for at least the years 2003 through 2007, Turkcan provided, or caused to be provided, to KPMG his registers reflecting fabricated gains and losses from FBM's fictitious trading of mortgage-backed securities.  These registers were false and misleading because, among other reasons, they did not disclose that certain of the purported gains were actually not trading gains but rather were the proceeds of repos obtained from Bear Stearns.  Turkcan did not disclose, or cause others to disclose, to KPMG that the registers contained false and misleading information.

42.      Turkcan also failed to disclose, or caused others to fail to disclose, to KPMG in connection with its annual audits for at least the years 2003 through 2007 the existence of monthly account statements from Bear Stearns that reflected the true nature of FBM's repo transactions with Bear Stearns.

43.      The false and misleading information that Turkcan provided, or caused to be provided, to KPMG and the information that Turkcan failed to disclose, or caused others to fail to disclose, to KPMG was material because a reasonable investor would consider it important that First Banks, Inc.'s net income was substantially different than actually reported due to one of its officers perpetrating a fraudulent scheme to misstate his division's earnings.

E.      **Turkcan's Ill-Gotten Gains**

44.     Turkcan received annual cash bonuses of $40,000 or more for each year from at least 2003 through 2007.  The amount of these bonuses was influenced by FBM's financial results.

45.     In 2005 and 2006, Turkcan also received Performance Incentive Plan ("PiP") units, a form of incentive compensation, which resulted in payments to Turkcan of $33,250 and $25,000 in 2007 and 2008, respectively.  The amount of the payments was determined by First Banks, Inc.'s financial results, most importantly its net income, in the two years following the grant of the units.

46.     During the period that Turkcan received the bonuses and PiP units, he knowingly or recklessly caused First Banks, Inc.'s net income to be materially misstated and knowingly or recklessly caused First Banks, Inc. to file materially false and misleading financial statements with the Commission.

## COUNT I

### Violations of Section 17(a)(1) of the Securities Act

47.     Paragraphs 1 through 46 are realleged and incorporated by reference.

48.     By engaging in the acts and conduct as more fully described in Paragraph 47 above, Turkcan, directly or indirectly, in the offer or sale of securities, namely variable rate trust preferred securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed devices, schemes, or artifices to defraud.

49.     Turkcan knew or was reckless in not knowing of the activities described in Paragraphs 47 and 48 above.

50.     In engaging in the conduct described in Paragraphs 47 and 48 above, Turkcan acted with scienter, that is, with an intent to deceive, manipulate, and defraud or with recklessness.

51.     By reason of the activities described in Paragraphs 48, 49, and 50 above, Turkcan violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act

52.     Paragraphs 1 through 46 are realleged and incorporated by reference.

53.     By engaging in the acts and conduct as more fully described in Paragraph 52 above, Turkcan, directly or indirectly, in the offer or sale of securities, namely variable rate trust preferred securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

    a.   obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and

    b.   engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

54.     By reason of the activities described in Paragraphs 53 above, Turkcan violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2 and 77q(a)(3))].

## COUNT III

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

55.     Paragraphs 1 through 46 are realleged and incorporated by reference.

56.     By engaging in the acts and conduct as more fully described in Paragraph 55 above, Turkcan, in connection with the purchase and sale of securities, namely variable rate trust preferred securities, by the use of the means and instrumentalities of interstate commerce and of the mails, directly or indirectly: employed devices, schemes, or artifices to defraud; made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices, or courses of business which have operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of such securities.

57.     Turkcan knew or was reckless in not knowing of the activities described in Paragraphs 55 and 56 above.

58.     In engaging in the conduct described in Paragraphs 55 and 56 above, Turkcan acted with scienter, that is, with an intent to deceive, manipulate, and defraud or with recklessness.

59.     By reason of the activities described in Paragraphs 56, 57, and 58 above, Turkcan violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## COUNT IV

### Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 Thereunder

60.     Paragraphs 1 through 46 are realleged and incorporated by reference.

61.     By engaging in the acts and conduct as more fully described in Paragraph 60 above, Turkcan knowingly circumvented a system of internal accounting controls and knowingly falsified books, records, or accounts subject to Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

14

62.     Turkcan knew or was reckless in not knowing of the activities described in Paragraphs 60 and 61 above.

63.     In engaging in the conduct described in Paragraphs 60 and 61 above, Turkcan acted with scienter, that is, with an intent to deceive, manipulate, and defraud or with recklessness.

64.     By reason of the activities described in Paragraphs 61, 62, and 63 above, Turkcan violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## COUNT V

### Violations of Rule 13b2-2 Under the Exchange Act

65.     Paragraphs 1 through 46 are realleged and incorporated by reference.

66.     By engaging in the acts and conduct as more fully described in Paragraph 65 above, Turkcan, an officer of First Banks, Inc., directly or indirectly, made or caused to be made materially false or misleading statements or omitted to state, or caused others to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to an accountant in connection with an audit, review, or examination of the financial statements of First Banks, Inc. or the preparation or filing of a document or report required to be filed with the Commission.

67.     By reason of the activities described in Paragraph 66 above, Turkcan violated Rule 13b2-2 [17 C.F.R. § 240.13b2-2] promulgated under the Exchange Act [15 U.S.C. § 78a et seq.].

## COUNT VI

### Aiding and Abetting Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder

68.     Paragraphs 1 through 46 are realleged and incorporated by reference.

69.     By engaging in the acts and conduct as more fully described in Paragraph 68 above, First Banks, Inc. violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13], which obligate issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to file with the Commission accurate periodic reports, including annual, current, and quarterly reports.

70.     By engaging in the acts and conduct as more fully described in Paragraph 68 above, Turkcan knowingly provided substantial assistance to First Banks, Inc.'s filing of materially false and misleading reports with the Commission, and, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)], thereby aided and abetted First Banks, Inc. in its violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## COUNT VII

### Aiding and Abetting Violations of Section 13(b)(2)(A) of the Exchange Act

71.     Paragraphs 1 through 46 are realleged and incorporated by reference.

72.     By engaging in the acts and conduct as more fully described in Paragraph 71 above, First Banks, Inc. violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to make and keep books, records, and accounts which, in

reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

73.     By engaging in the acts and conduct as more fully described in Paragraph 71 above, Turkcan knowingly provided substantial assistance to First Banks, Inc.'s failure to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect its transactions and dispositions of assets, and, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)], thereby aided and abetted First Banks, Inc. in its violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## COUNT VIII

### Aiding and Abetting Violations of Section 13(b)(2)(B) of the Exchange Act

74.     Paragraphs 1 through 46 are realleged and incorporated by reference.

75.     By engaging in the acts and conduct as more fully described in Paragraph 74 above, First Banks, Inc. violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to: (A) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (B) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

76.     By engaging in the acts and conduct as more fully described in Paragraph 74 above, Turkcan knowingly provided substantial assistance to First Banks, Inc.'s failure to devise and maintain a sufficient system of internal accounting controls, and, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)], thereby aided and abetted First Banks, Inc. in its violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that the Court enter a Final Judgment:

### I.

Finding that defendant Turkcan committed the violations alleged above.

### II.

Permanently restraining and enjoining defendant Turkcan from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)], Sections 10(b) and 13(b)(5)of the Exchange Act [15 U.S.C. §§ 78j(b) and 77m(b)(5)] and Rules 10b-5, 13b2-1, and 13b2-2 thereunder [17 C.F.R. §§  240.10b-5, 240.13b2-1, and 240.13b2-2], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

### III.

Ordering defendant Turkcan to pay to the Commission disgorgement of all ill-gotten gains that he received as a result of the acts and courses of conduct complained of herein, with prejudgment interest thereon.

IV.

Ordering defendant Turkcan to pay civil penalties pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C.

§ 78u(d)(3)].

V.

Prohibiting defendant Turkcan pursuant to Section 21(d)(2) of the Exchange Act [15

U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] from acting as

an officer or director of any issuer that has a class of securities registered pursuant to Section 12

of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d)

of the Exchange Act [15 U.S.C. § 78o(d)].

VI.

 Retaining jurisdiction of this action in accordance with the principals of equity and the

Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and

decrees that may be entered or to entertain any suitable application or motion for additional relief

within the jurisdiction of this Court.

VII.

Granting such further relief as the Court may deem appropriate.

Dated: February 4, 2009                    Respectfully submitted,


                                           /s/ Daniel S. Ryan
                                           James A. Davidson (IL Bar #: 6206786)
                                           Kara M. Washington (IL Bar #: 6226335)
                                           Daniel S. Ryan (IL Bar #: 6279737)
                                           ATTORNEYS FOR PLAINTIFF
                                           U.S. SECURITIES AND EXCHANGE
                                           COMMISSION
                                           175 West Jackson Boulevard, Suite 900
                                           Chicago, IL 60604
                                           Telephone: 312.353.7390
                                           Fax: 312.886.8514

<u>**CERTIFICATE OF SERVICE**</u>

Daniel S. Ryan, an attorney, hereby certifies that he caused a copy of Plaintiff's Complaint to be served upon:

> Arthur Margulis
> William Margulis
> MARGULIS GRANT & MARGULIS, P.C.
> 11 South Meramec Avenue, Suite 1330
> St. Louis, Missouri 63105

through the Court's CM/ECF system and by facsimile on this 4th day of February, 2009.

/s/ Daniel S. Ryan